IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JULIE STOUT                                                                                     PLAINTIFF

V.                                          NO. 09-5089

MICHAEL ASTRUE,
Commissioner of Social Security                                                 DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Julie Stout, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner), denying her claims for a period of disability and disability insurance benefits under Title II of the Social Security Act (the Act) and Supplemental Security Income under Title XVI of the Act. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**Procedural Background**

Plaintiff protectively filed for disability insurance benefits and supplemental security income on April 18, 2005, alleging disability since January 1, 2005. (Tr.13 ).[1] Plaintiff's applications were denied initially and on reconsideration. (Tr. 13). Pursuant to Plaintiff's request, a hearing before an Administrative Law Judge (ALJ) was held on September 21, 2007, at which Plaintiff testified. (Tr. 639-673). On March 20, 2008, the ALJ issued an unfavorable decision. (Tr. 10-25). The Appeals Council denied Plaintiff's request for review on March 26,

---

[1] Plaintiff previously filed applications in 1999 and 2001. An unfavorable hearing decision was issued on the 1999 applications and the 2001 applications were dismissed at the hearing level. (Tr. 13).

2009, and the decision of the ALJ therefore became the final decision of the Commissioner. (Tr. 4-7).

In his decision, the ALJ found that Plaintiff had the following severe impairments: hypertension; arthritis; morbid obesity; depressive disorder, NOS; panic disorder with agoraphobia and/or anxiety disorder, NOS; and personality disorder, NOS, with dependent traits. (Tr. 16). However, the ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17). After carefully considering the entire record, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform sedentary work[2] with certain restrictions. (Tr. 19). More specifically, the ALJ found:

> ...[T]hat the claimant has the residual functional capacity to lift/carry 10 pounds occasionally and less than 10 pounds frequently, push/pull within those limitations, sit six hours and stand/walk two hours. In addition, the undersigned finds that the claimant cannot climb ladders, ropes and scaffolds and crawl and that she can only occasionally climb stairs and ramps, balance, stoop, kneel and crouch. Further, the undersigned finds that the claimant must avoid hazards, including unprotected heights and moving machinery. Lastly, the undersigned finds that the claimant is moderately limited in her ability to make judgments on simple work-related decisions, understand, remember and carry out complex instructions, respond appropriately to usual work situations and routine work changes and interact appropriately with the public, coworkers and supervisors. For the purpose of this decision, "moderately limited" means there is more than a slight limitation but that the person can still function in a satisfactory manner.

(Tr. 19).

The ALJ found that Plaintiff was unable to perform any past relevant work,[3] was

---

[2] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §416.967(a).

[3] Plaintiff had previously worked as a home health care provider, and at Tyson, restaurants, nursing homes, and gas station kiosks. (Tr. 648).

considered a younger individual on the alleged disability onset date, had a high school education and was able to communicate in English. (Tr. 23). After considering Plaintiff's age, education, work experience, and RFC, and with the help of a Vocational Expert (VE), the ALJ found there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform: cashier; bench assembler; and production inspector/checker. (Tr. 24). The ALJ therefore found that Plaintiff was not disabled. (Tr. 25). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and this case is before the undersigned for report and recommendation.

**Evidence Presented**

Plaintiff was born in 1966 and completed high school. (Tr. 641, 644). The 673 page transcript includes medical records which date back to 1996, when Plaintiff was diagnosed at the Ozark Guidance Center (OGC) with Dysthymic Disorder, Major Depression, Eating Disorder, Probable OCD features, and Severe Obesity. (Tr. 213). In 1996, Plaintiff weighed 280 pounds and was 5' 7" tall. Plaintiff sought treatment over the next several years at OGC, Community Clinic at St. Francis House (CCSFH), and Northwest Medical Center of Washington County (NWMC), weighing anywhere from 328.5 pounds to 341 pounds. (Tr. 398, 391, 296, 286, 255-259, 590, 362, 363).

On July 18, 2005, a General Physical Examination for the Social Security Administration was conducted by Dr. K. Marcus Poemoceah. (Tr. 316-322). Plaintiff then weighed 326 pounds and was taking Prozac, Vistaril, Proxacam, and Atenolol. (Tr. 316). Plaintiff was found to have normal range of motion in her spine and normal range of motion in her extremities, with no muscle weakness. (Tr. 319-320). With respect to her limb function, she was able to do

-3-

everything except walk on heels and toes or squat and arise from a squatting position. (Tr. 320). Lumbar spine x-rays showed some facet arthritis and joint space narrowing, and x-rays of her right knee AP & lateral were essentially unremarkable, with good joint space, and no significant sclerosis was seen. (Tr. 321). Dr. Poemoceah diagnosed Plaintiff with:

- Hypertension, controlled;
- Arthritis;
- History of probable carpal tunnel bilateral;
- Morbid obesity; and
- History of depression and anxiety.

(Tr. 322).

On July 20, 2005, Brad Williams, Ph.D, a non-examining psychologist, completed a Psychiatric Review Technique, and found Plaintiff to have mild restriction of activities of daily living, mild difficulty in maintaining social functioning, mild difficulty in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 424). Dr. Williams also found that Plaintiff had no current mental health treatment other than medications from her physical doctors. He felt that Plaintiff's main limitations were physical, and that her mental concerns did not significantly limit her functioning. (Tr. 426).

On July 25, 2005, a Physical RFC Assessment was completed by Dr. Robert Redd, a non-examining physician. (Tr. 323-330). Dr. Redd found that Plaintiff could occasionally lift and/or carry less than 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk at least 2 hours in an 8-hour workday, sit about 6 hours in an 8 hour workday, and push and/or pull within these limitations. He found that with respect to postural limitations, she could occasionally climb, balance, stoop, kneel, crouch and crawl. Dr. Redd referenced Plaintiff's obesity when he rated Plaintiff's postural limitations. (Tr. 325). No manipulative, visual,

communicative, or environmental limitations were established. (Tr. 325-337).

On June 5, 2006, Plaintiff reported back to OGC, and stated that she felt her medications were not working well. She was then on 60 mg. of Prozac and Hydroxaxine for anxiety. Plaintiff stated that she thought of suicide several times a week but did not think she would actually do anything to harm herself. She felt she would more likely hurt someone else, but had never actually struck out at anyone. (Tr. 620). On June 20, 2006, Plaintiff stated that she was doing a lot better since her medication was adjusted and that she had not smoked for four weeks. (Tr. 613). Plaintiff was felt to have made positive progress as evidenced by less depression and positive actions being taken. (Tr. 613).

On July 17, 2006, Plaintiff underwent a Psychological Screening Evaluation by Letitia C. Hitz, Ph.D. (Tr. 434-436). Plaintiff reported that she had identified gastric bypass surgery as a last resort to managing her weight. She believed that her various health problems were so great that she felt that the risks of the surgery would be lower than the risks associated with carrying around all her weight. (Tr. 494). Plaintiff had gained approximately one hundred pounds the previous three to five years, due to overeating related to depression. Plaintiff's panic attacks were more controlled, and she stated that she had learned some behavioral techniques to address her anxiety symptoms, and they were effectively managed with medication. Plaintiff was diagnosed with:

- Axis I: Depressive disorder NOS; panic disorder with agoraphobia; psychological symptoms affecting obesity;
- Axis II: Diagnosis deferred, and
- Axis III: Obesity.

(Tr. 435).

Thereafter, Plaintiff went through several tests and evaluations to determine whether she would be a good candidate for the gastric bypass surgery. (Tr. 441-447, 463-464, 453-454, 450, 478-483, 633, 476). On November 6, 2006, the Bariatric Coordinator at Washington Regional Bariatric Health Center sent a letter to John Mathis, at Vocational Rehabilitation Services, advising him that a physician referred to as "Dr. Wood" had declined to take Plaintiff's case because her weight was above the maximum capacity, and because the records reflected multiple referrals for counseling at OGC, with failure to follow through. (Tr. 485). It was felt that this type of surgery could be dangerous to the non-compliant patient, and that if Plaintiff was able to follow the recommendations of the psychologist and continue therapy for the issues that arose, with documentation of compliance, she might be able to reapply. (Tr. 485).

As of January 17, 2007, Plaintiff weighed 360 pounds, and on February 5, 2007, M. Chantal Sumlin, APN, from CCSFH, wrote a letter to John Mathis, stating that she felt there were no psychological problems that would keep Plaintiff from "benefiting [sic] [from] bariatric surgery." She recommended that Plaintiff begin individual psychiatric treatment and if compliant, would recommend that psychiatric support continue after surgical intervention. (Tr. 634, 636).

On April 1, 2007, Plaintiff was admitted to the Medical Attendant Bariatric Program at the Hot Springs Rehabilitation Center (HSRC), weighing 377 pounds. (Tr. 514, 515). Radiology Services at HSRC indicated that Plaintiff's cervical spine showed straightening of the curve, but no significant findings were seen otherwise. Plaintiff's lumbar spine showed mild degenerative change, her hips showed bilateral arthritis, and her knees showed bilateral medial joint space narrowing. (Tr. 516-519).

-6-

On April 7, 2007, Dr. Allen Dale Kincheloe, an orthopedic consultant at HSRC, reported Plaintiff weighing about 375 pounds, complaining of pain in her lower back and in her hips when walking or standing, and noted that she had decreased range of motion of her right hip. (Tr. 494). He concluded that x-rays of her cervical spine showed no fractures, dislocations or lesions, the lumbar spine showed a little spurring on the anterior superior aspect of L5, and the disc space appeared to be within normal limits. With respect to her knees, he found there to be a slight decrease in articular cartilage space and a very minimal amount of spurring. In her hips, Plaintiff had conical shaped femoral heads with slight decrease in the articular cartilage space and had a femoral head acetabular dysplasia on the right side. (Tr. 494). Plaintiff could get to within 6 inches of the floor, bend to the right 30 degrees, to the left 30 degrees, and could extend 30 degrees. She could also stand on her heels and her toes. Deep tendon reflexes were present and equal bilaterally and her neurovascular was within normal limits. Dr. Kincheloe felt that plaintiff's obesity was causing the pain in her back and that she had minimal dysplasia of the hips, with pain in this region. (Tr. 494).

On April 25, 2007, Dr. Randall Wells, a consulting psychiatrist, reported that Plaintiff told him that her depressive symptoms seemed to be responding well to Prozac, and she denied any adverse medication effects. (Tr. 488). She hoped to attend National Park Community College and felt Prozac remained helpful for her depressive symptoms. (Tr. 489). He diagnosed Plaintiff with major depression, recurrent, severe without psychosis, responding to current treatment; anxiety disorder NOS, responding to current treatment; physical and sexual abuse of child-victim; morbid obesity; hypertension; and arthritic changes. (Tr. 489).

On May 23, 2007, Plaintiff was admitted to National Park Medical Center with acute

cholecystitis, weighing 330 pounds. (Tr. 543). On May 24, 2007, surgery was performed on Plaintiff to remove her gallbladder. (Tr. 546-555). Subsequent thereto, Plaintiff continued to have abdominal pain and had an abnormal liver function test, and on September 13, 2007, an ERCP (endoscopic retrograde cholangiopancreatography) was performed by Dr. John O. Brandt to rule out choledocholithiasis or biliary stricture. (Tr. 593). The impression of the ERCP was that both the common duct and pancreatic ducts were unremarkable. (T. 597).

At the hearing before the ALJ held on September 21, 2007, Plaintiff testified that she weighed 272 pounds, a loss of over 100 pounds in less than six months, and was residing at the Arkansas Rehabilitation Center. (Tr. 645). She stated that she had a nice room, the cafeteria prepared her meals and the bus driver drove her to the community college, where she was taking 12 hours. (Tr. 655). Someone also monitored the food she ate and oversaw her at college. She stated that she was given special accommodations at the college - a quiet place to read or a little extra test time due to her anxiety or her disabilities. (Tr. 655-656). Although Plaintiff stated that she was struggling in college, she testified that she was making "B's". (Tr. 658). She stated that she could not stand for a half an hour without moving, still had a lot of hip pain, but could walk a lot further now than previously. (Tr. 661). She stated that she had to get away from people sometimes and away from the noise, because noise increased her anxiety. Plaintiff stated that she took Vistaril three times a day for mild anxiety, which caused drowsiness, and Ativan, for severe anxiety, which knocked her out. (Tr. 663). Nevertheless, Plaintiff stated that she still continued to go to her classes. (Tr. 664).

Plaintiff testified that she had pain in her hips all the time, took a non-narcotic pain medication for it, and that the medication helped but did not eliminate the pain. (Tr. 665). She

-8-

AO72A
(Rev. 8/82)

stated that since being medicated, she did not have the crying spells as before. She further stated that she could bend from her waist to pick up things from the floor, and that yoga taught her deep breathing and stretching to control her anxiety. (Tr. 666). Plaintiff testified that the "doctor told me I had carpal tunnel syndrome" and that surgery was an option. She also testified that she had numbness and tingling in her hands and that they hurt all the time because she had to take notes in class.[4] (Tr. 668). Plaintiff stated that she could sit comfortably on her hips for an hour and that she felt better since she lost weight. (Tr. 669). She was having more trouble with her knees since she had been riding the bicycle, and stated that taking Trazodone at bedtime was really helping her sleep. (Tr. 670). Plaintiff stated that she did not believe she would be able to show up every day for a 40 hour a week job. She also started smoking again in July of 2007, and at the time of the hearing, was smoking about a pack a day. (Tr. 671-672). On January 29, 2008, Plaintiff reported to the CCSFH, weighing 269 pounds, and again on February 16, 2008, weighing 280. (Tr. 627, 624).

      The ALJ sent a questionnaire to the VE, asking him to assume an individual could occasionally lift/carry 10 pounds and frequently less than 10, could push/pull within the same limitations, could not climb ladders, ropes, and scaffolds and could not crawl. (Tr. 194). He also asked the VE to assume that this person must avoid hazards, including unprotected heights and moving machinery, could occasionally climb stairs and ramps, balance, stoop, kneel, and crouch. In addition, he asked the VE to assume that this person could sit for 6 hours and stand/walk for 2 hours, was moderately limited in making judgments on simple work-related decisions, understanding, remembering, and carrying out complex instructions, and in responding

---

[4]Plaintiff also testified that she had a voice-activated tape recorder to record her lectures. (Tr. 668).

appropriately to usual work situations and routine work changes. (Tr. 194). The VE responded by stating that this individual could perform the work of a cashier, bench assembler, and production inspector/checker. (Tr. 195).

**Applicable Law**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results

from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments;  (3) whether the impairment(s) met or equaled an impairment in the listings;  (4) whether the impairment(s) prevented the claimant from doing past relevant work;  and, (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**Discussion**

### A.  Physical Impairments

The ALJ determined that Plaintiff's alleged disability due to bilateral carpal tunnel syndrome was not severe. As stated by the ALJ, there is no diagnosis of carpal tunnel syndrome in the medical evidence of record. Instead, in 2005, Dr. Poemoceah diagnosed only a history of probable carpal tunnel syndrome, and reported that although Plaintiff had symmetrically diminished reflexes in her biceps, triceps, patellar and achilles, she had a normal range of motion

-11-

in her extremities, no muscle weakness or atrophy, no sensory abnormalities, and her upper limb function was normal. (Tr. 319-320). In Dr. Robert Redd's 2005 Physical RFC Assessment, he stated that no manipulative limitations were established. The Court believes the ALJ was correct in finding that bilateral carpal tunnel syndrome was not a severe impairment.

With respect to Plaintiff's hypertension, Plaintiff had been on various medications over the years and a cardiac ultrasound, performed on January 30, 2007, revealed upper limits of normal left ventricular size with grossly normal systolic function, mildly dilated proximal aortic root, no obvious valvular abnormalities, and normal spectral flow doppler velocities . (Tr. 470-471).

Plaintiff alleged an onset date of January 1, 2005. However, the medical records reflect that Plaintiff saw a physician in March and June of 2003 for her knees, but did not seek medical attention thereafter until April 19, 2005, when she reported to NWMC with knee pain. Thereafter, on July 18, 2005, Plaintiff was found to have normal range of motion in her spine and in her extremities and no muscle weakness. She was able to do everything except walk on her heels and toes or squat and arise from a squatting position. In addition, in the 2005 Physical RFC Assessment, Plaintiff was found to be able to do those things required of sedentary work, except that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl.

At various time in 2006, Plaintiff was sleeping from 10 AM to 2 PM and then getting up and doing housework. She swam in the lake two or three times a week, and walked to the grocery store and a monster truck show. (Tr. 441, 443).

On April 3, 2007, when Plaintiff weighed 375 pounds, Dr. Allen Dale Kincheloe, an

-12-

orthopedic consultant, found that Plaintiff's obesity was causing pain in her back and that Plaintiff had minimal dysplasia of the hips, with pain in this region.[4] "[W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. Pt. 404. P, App 1. In the present case, the ALJ considered carefully all of the records regarding Plaintiff's musculoskeletal impairments and the cumulative effect of her obesity. He noted that Plaintiff was obese before her alleged onset date and that it did not result in her inability to perform routine movement and necessary physical activity within the work environment at that time. (Tr. 21). The records also reflect that on April 3, 2007, Plaintiff was reported as moving extremely well and was flexible, even when she weighed 375 pounds, before she lost 100 pounds.

As stated earlier, at the hearing before the ALJ in September of 2007, Plaintiff testified that she was living at the HSRC, taking 12 hours at a community college, pursuing an associate of arts degree in teaching, and that she could walk further than she used to be able to walk. She also stated that she took pain medication, which helped with her pain, although it did not eliminate it. She stated that she could sit comfortably on her hips for an hour and that she felt better since she lost weight. There is no evidence that Plaintiff was unable to prepare her own meals, or drive, or care for her own personal grooming needs.

---

[4]The Court notes that Dr. John Brandt performed a physical on Plaintiff a few months later on September 5, 2007, but said exam focused on pain in Plaintiff's mid epigastric region, which was dull, and radiated to the middle of her back. An ERCP was performed by Dr. Brandt a week later, revealing unremarkable common and pancreatic ducts.

**B. Mental Impairments**

In her brief, Plaintiff argues that the ALJ wrongfully concluded that Plaintiff did not meet a listing-level severity at step three of the five-step sequential evaluation process set forth under the Social Security Act. (Doc. #7 at p. 4). Plaintiff argues that her difficulties in maintaining concentration, persistence, and pace are more than moderate and that she meets the requirements of Listing 12.04(B) by having marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, or pace. The Defendant contends there is substantial evidence to support the ALJ's finding that Plaintiff did not meet or equal listing 12.04 or 12.06 at any time relevant to this decision.

In Pratt v. Sullivan, 956 F.2d 830 (8th Cir. 1992), the Court addressed the sequential process for evaluating mental impairments as set out in 20 C.F.R. §404.1520a.

> The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. Id. §404.1520a(b)(1). These are gleaned from a mental status exam or psychiatric history, id., and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. See id. §404.1508. If a mental impairment is found, as it should have been in this case, (footnote omitted) the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. Id. §404.1520(b)(2).
>
> The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. Id. §404.1520a(b)(3). Those areas are: activities of daily living; social functioning; concentration, persistence or pace; and deterioration or decompensation in work or work-like settings. Id. ... After rating the degree of functional loss, the ALJ is to determine the severity of the mental impairments with reference to the ratings. Id. §404.1520a(c). If the mental impairment is severe, then the ALJ must determine whether it meets or equals a listed mental disorder. Id. §404.1520a(c)(2) (footnote omitted). ...If the claimant has a severe impairment, but the impairment neither meets or equals the listing, then the ALJ is to do a residual functional capacity assessment. (Footnote omitted). See id. §404.1520a(c)(3).

Id. at 834-35.

In terms of daily living, in April of 2006, Plaintiff was separated from her husband and living with her parents. Her 15 year old step-son moved in with her and her parents. In July of 2006, Plaintiff was actively working on her diet and exercise and quit smoking for a period of time. Although Plaintiff spent a tremendous amount of time sleeping in September of 2006, she did not demonstrate significant obstructive sleep apnea, and by the time of the hearing her medication was helping her to sleep effectively. In addition, as stated earlier, in the fall of 2007, Plaintiff was attending 12 hours of college courses, making "B's", receiving tutoring in algebra and composition one, exercising on the bicycle, and smoking about a pack of cigarettes a day.

With respect to social functioning, the ALJ found Plaintiff to have moderate difficulty. Plaintiff testified that sometimes she had to get away from people and noise. However, the records do not indicate that she had any trouble attending college classes, interacting with her tutors, classmates, professors, bus driver or therapists. Furthermore, Plaintiff stated that she sat in the front of the classroom at school, and there is no indication that Plaintiff missed any school because of any mental impairment. In addition, as pointed out by the ALJ, progress notes from the Bariatric Program at HSRC showed that Plaintiff was attending weekly weight management nutrition classes and that she participated in open discussion. (Tr. 498). In his Psychiatric Review Technique dated July 20, 2005, Dr. Brad Williams felt that Plaintiff's main limitations were physical and her mental concerns did not significantly limit Plaintiff's functioning. Furthermore, the records also do not reflect that Plaintiff had any difficulty with her social functioning at her previous employments.

With respect to Plaintiff's concentration, persistence, or pace, the fact that Plaintiff has

-15-

been able to make "B's" in her college courses speaks to the fact that Plaintiff has a good ability to concentrate and keep up with the pace of the school load.  As referenced by the ALJ, on April 12, 2007, a Neuropsychological Screen was performed on Plaintiff, and it was found that Plaintiff's test scores were consistent with average intellectual capacity, that she had orientation to person, place, and time, and was alert.  She had no difficulty with a simple task of visual spatial analysis, performing a verbal memory task, doing simple mental calculations, categorizing words, defining words, nonverbal abstract reasoning, or being able to state an appropriate course of action for various problems of daily living.  Finally, there is no evidence of episodes of decompensation.

The Court finds that the ALJ conducted the required mental status evaluation technique specified in the regulations and correctly concluded that Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04, 12.06 or 12.09.

### C.  Subjective Complaints and Credibility Analysis

The ALJ also found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, although he also found that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment.

In assessing Plaintiff's subjective complaints, the ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of

her pain: (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

As noted earlier, in 2006, while continuing to suffer from knee and hip pain and depression, Plaintiff attended nutrition education classes, swam in the lake two to three times a week, walked to the grocery store and to a monster truck show. She also successfully attended and participated in exercise classes at HSRC. By 2007, Plaintiff had lost almost 100 pounds, her depressive symptoms were responding well to Prozac, she could walk further than before, and her anxiety was responding to treatment. Although Plaintiff had previously taken narcotic pain medication to treat her pain, at the hearing Plaintiff said that HSRC dispensed the medication to her and that she was taking non-narcotic pain medication. (Tr. 665).

Pain is considered disabling when it is not "remediable and precludes a claimant from engaging in any form of substantial gainful activity." Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994) quoting from Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989). The question is not whether Plaintiff experiences pain, but rather whether the pain is so severe as to be disabling. See Baker v. Apfel, 159 F.3d 1140, 1145 (8th Cir. 1998)(the inconsistencies the ALJ relied on to disbelieve Baker included Baker's ability to maintain a 3.1 average as a full-time college student, attend AA meetings, drive, cook meals, and visit friends and relatives.) The ALJ may

-17-

disbelieve subjective complaints of pain if there are inconsistencies in the evidence as a whole. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) citing Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The Court is of the opinion that the ALJ was correct in concluding that Plaintiff's allegation of pain was not totally credible in light of her activities and failure to take narcotic pain medication, which are inconsistent with disabling pain.

### D.  RFC Assessment

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §404.1545(a)(3). The United Stated Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered the medical records, the medical assessments of non-examining agency medical consultants, and Plaintiff's subjective complaints when he

determined that Plaintiff could perform sedentary work with certain limitations. Based upon the record as a whole, the Court believes there is substantial evidence to support the ALJ's RFC determination.

### E. Hypothetical Question to the Vocational Expert

The hypothetical the ALJ posed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997); Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996). Accordingly, the Court is of the opinion that the VE's written response to the hypothetical constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff is not disabled as she is able to perform work as a cashier, bench assembler, or production inspector/checker.

Accordingly, the undersigned recommends that the opinion of the ALJ be affirmed in its entirety. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

ENTERED this 13th day of April, 2010.

*/s/ Erin L. Setser*
  HON. ERIN L. SETSER
  UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)